# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

LAURANN BEDEN,

     *Plaintiff,*

*v.*                      CASE NO. 2:14-CV-14727-MAG-PTM

COMMISSIONER OF          DISTRICT JUDGE MARK GOLDSMITH
SOCIAL SECURITY,         MAGISTRATE JUDGE PATRICIA MORRIS

     *Defendant.*

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and that Defendant's Motion for Summary Judgment be **GRANTED**.

## II.    REPORT

### A.    Introduction and Procedural History

---

[1] The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008 RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

This case was referred to Magistrate Judge Patricia T. Morris, *see* 28 U.S.C. § 636(b)(1)(B); E.D. Mich. LR 72.1(b)(3), by Notice of Reference to review the Commissioner's decision denying Plaintiff's claim for Disability Insurance Benefits and Supplemental Security Income. This matter is currently before the Court on cross-motions for summary judgment. (Docs. 13, 14.)

Plaintiff Laurann Beden was fifty-one years old at the time of the most recent administrative hearing on August 22, 2013. (Transcript, Doc. 11 at 36.) Plaintiff has never worked. (Tr. at 185.) Plaintiff filed the present claim on June 29, 2012 (Tr. at 115-22.) alleging that she became unable to work on January 1, 2002. (Tr. at 115.) The claim was denied at the initial administrative stage. (Tr. at 66-67.) In denying Plaintiff's claim, the Commissioner considered schizophrenia, paranoid & other psychotic disorders, and other and unspecified arthropathies. (*Id.*) On August 22, 2013, Plaintiff appeared before Administrative Law Judge ("ALJ") Oksana Xenos, who considered the application for benefits *de novo*. (Tr. at 33-51.) In a decision dated September 4, 2013, the ALJ found that Plaintiff was not disabled. (Tr. at 17-32.)

On October 23, 2014, the ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), when, after review of additional exhibits[1] (Tr. at 190-91, 475-85), the Appeals Council

_____

[1]In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is

denied Plaintiff's request for review. (Tr. at 1-6.) On December 15, 2014, Plaintiff filed the instant suit, seeking judicial review of the Commissioner's unfavorable decision. (Doc. 1 at 1.)

### B.    Standard of Review

The Social Security Administration has promulgated the following rules for the administration of disability benefits. *See* 20 C.F.R. §§ 401-422. First, a state agency, acting under the authority and supervision of the Administration, usually makes the initial determination of whether a person is disabled. 20 C.F.R. § 404.1503; *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987). If denied, the claimant may seek review of the state's decision through the Administration's three-stage review process. *Bowen*, 482 U.S. at 142. In the first step of this process, the state's disability determination is reconsidered *de novo* by the state agency. *Id.* Next the claimant has the right to a hearing before an ALJ. *Id.* Finally, "the claimant may seek review by the Appeals Council." *Id.* Only after the Commissioner has issued a final administrative decision that is unfavorable may the claimant file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decisions under 42 U.S.C. § 405(g). This is a limited review where we "'must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact

---

the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

unsupported by substantial evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (*quoting Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004); *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997).

### C.   The ALJ's Five-Step Sequential Analysis

The "[c]laimant bears the burden of proving his [or her] entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord Bartyzel v. Comm'r of Soc. Sec.*, 74 F. App'x 515, 524 (6th Cir. 2003). While, in general, the claimant "is responsible for providing the evidence" to make a residual functional capacity ("RFC") assessment, before a determination of not disabled is made, the Commissioner is "responsible for developing [a claimant's] complete medical history, including arranging for a consultative examination[] if necessary." 20 C.F.R. § 404.1545(a)(3).

Disability Insurance Benefits ("DIB"), provided for in Title II, 42 U.S.C. §§ 401-434, are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Supplemental Security Income ("SSI"), provided for in Title XVI, 42 U.S.C. §§ 1381-1385, is available to poverty-stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which can be

4

> expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905(a). Disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920; *see also Heston v.Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by" an impairment that precludes performance of past relevant work. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003) (cited with approval in *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540 (6th Cir. 2007)). If the

5

analysis reaches step five, the burden shifts to the Commissioner to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citing 20 C.F.R. §§ 416.920(a)(4)(v), 416.920(a)(4)(g)); *see also Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).

### D.      The ALJ's Findings

The ALJ applied the five-step disability analysis to Plaintiff's claim and found at Step One that Plaintiff had not engaged in substantial gainful activity since April 25, 2012, the application date. (Tr. at 22.) At Step Two, she found that Plaintiff's impairments of osteoarthritis of the knees and schizoaffective disorder were "severe" within the meaning of 20 C.F.R. § 404.1520 and § 416.920, and that Plaintiff's history of polysubstance abuse was non-severe. (*Id.*) At Step Three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or was the medical equivalent of a listing in the regulations. (Tr. at 22-23.) At Step Four, she found that Plaintiff was unable to perform any past relevant work. (Tr. at 19.) He also found that there was no past relevant work and that on the date the application was filed, Plaintiff was an individual closely approaching advanced age. (Tr. at 26.) At Step Five, the ALJ found that Plaintiff could perform a limited range of light work. (Tr. at 23-26.) Therefore, the ALJ found that Plaintiff was not disabled. (Tr. at 27-28.)

### E.      Administrative Record

### 1.      Medical History

### a.     *Treatment of Physical Conditions*

On May 11, 2011, Plaintiff sought emergency care for knee pain that she reported she had been experiencing for three weeks. (Tr. at 227.) She was given some Ibuprofen and was sent home in stable condition. (Tr. at 228.)

Plaintiff was seen at the Detroit Receiving Hospital for care on May 20, 2011, after she jumped from a car that she reported was going 45 miles per hour because she was being "forced to perform oral sex" "at gunpoint." (Tr. at 209, 258.) She was discharged that day in stable condition. (*Id*.) X-rays taken of her chest that day showed "[n]o specific abnormalities." (Tr. at 241.) An x-ray of Plaintiff's pelvis showed "[n]o evidence of a fracture or dislocation" but did reveal a "bullet fragment in the right gluteal region." (Tr. at 243.) X-rays of Plaintiff's lumbar and thoracic spine were "negative." (Tr. at 245, 247.) X-rays of Plaintiff's cervical spine showed "[n]o evidence of fracture or dislocation of the cervical spine" and "[n]o soft tissue abnormalities [were] seen." (Tr. at 249.) A CT scan of Plaintiff's head taken that day showed only a "scalp hematoma in the left parietal region" but "[o]therwise, no evidence of an acute abnormality in the head/brain." (Tr. at 251.)

Plaintiff also sought emergency care on April 5, 2012 for a strained neck after an assault of some kind. (Tr. at 209, 223.) She was discharged that day in stable condition. (*Id*.)

Based on Plaintiff's complaints of chest pain, chest x-rays were taken on March 3, 2012, showing "[d]evelopment of scarring/plate-like atelectasis in the left lower lobe. Otherwise no significant change from the prior exam of 5/20/2011." (Tr. at 239.)

Plaintiff again presented to the emergency room on May 5, 2012 for treatment after being "assaulted by her boyfriend, patient was kicked in the head, back and chest." (Tr. at 265.) She was noted to have "minor contusions and muscle strain," was given Motrin and discharged that day in stable condition. (Tr. at 267, 269.) That day, chest x-rays showed "[n]o acute pulmonary process" and "[n]o significant interval change." (Tr. at 229.) X-rays of Plaintiff's cervical spine and obliques taken that same day showed "[n]o acute fracture or subluxation" and a "[t]iny anterior osteophyte arising from the lower and C5 vertebral body." (Tr. at 231.) X-ray of Plaintiff's lumbar spine and thoracic spine showed "[n]o acute fracture or subluxation." (Tr. at 233, 235.)

Plaintiff sought emergency room treatment for knee pain again on August 7, 2012, her past history was noted and she was released in stable condition. (Tr. at 389-90.)

On December 3, 2012, Plaintiff sought treatment in the emergency room for knee pain. (Tr. at 377.) Notes indicated that Plaintiff "was counseled on the health benefits of smoking cessation and alcohol cessation." (Tr. at 378.) It was also noted that Plaintiff had a "bony crepitus bilaterally with her knees with a popliteal cyst which the patient has been diagnosed with already" and the doctor reported "I do not feel as though prescribing the patient narcotics for her chronic pain would be proper treatment for her and I will give her only Tylenol and Motrin." (*Id*.)

Plaintiff was examined, at the request of Disability Determination Services ("DDS") by Dr. Bina Shaw on September 4, 2012. (Tr. at 360-66.) Dr. Shaw found no signs of head injury, no eye, ear, nose or throat problems, no respiratory problems, no cardiovascular problems, no kidney or endocrine issues, no peripheral edema, no skin

8

problems, and no neurological issues. (Tr. at 360-61.) Plaintiff's chest, cardiovascular,
abdominal, and musculoskeletal exams were all normal. (Tr. at 361.) Dr. Shaw found
"[n]o pedal edema" and noted that although Plaintiff brought a cane, there was no limp
noted and her gait was "steady." (*Id.*) All neurological tests were normal and Plaintiff's
muscle strength was 5/5 in all extremities. (Tr. at 361-62.) Dr. Shaw diagnosed "[m]ild
degenerative arthritis in both knees" but concluded that Plaintiff "has no severe
functional impairment. She can sit, stand and walk, bend and lift at least 20 pounds of
weight without difficulty eight hours a day. She should avoid squatting." (Tr. at 362.) On
September 11, 2012, Dr. Shaw confirmed earlier findings, adding that Plaintiff "has no
problems with hearing." (Tr. at 371.) Studies of Plaintiff's knees taken on September 11,
2012, showed "degenerative changes." (Tr. at 376.)

On March 7, 2013, L. Bishop, APNP-BC, opined that Plaintiff could perform
sedentary work based on the cyst in her right knee. (Tr. at 396.)

On May 14, 2013, Plaintiff sought treatment at the Outpatient Specialty Clinic for
Orthopaedic, Hand and Podiatry. (Tr. at 399-405.) Plaintiff was evaluated by Hussein
Darwiche, M.D.  and Adam Urban, PA-C. (*Id.*) Valgus deformity was noted in both
knees, with the left being worse, but the knee was noted to be "stable to valgus stressing"
and "[p]osterior and anterior drawer signs [were] both negative." (Tr. at 400.) After it
was noted that radiographs of the left knee showed "extensive lateral joint line
osteoarthritis," Plaintiff was diagnosed with "osteoarthritis left knee." (*Id.*)

On June 14, 2013, x-rays of Plaintiff's left knee showed "mild osteoarthritis of the
left knee" and a "[s]mall calcification to the femoral condyle [that] may be secondary to

9

previous trauma." (Tr. at 408.) X-rays of Plaintiff's right knee showed "[m]oderate osteoarthritis of the right knee, progressed in the interval" and "[s]light interval increase in size of intraarticular loose body in the anterior intercondylar region." (Tr. at 409.)

### b.    Treatment of Mental Conditions

When assessed on September 13, 2011, Plaintiff reported that "she has not had mental health problems before sexual assault in May 2011." (Tr. at 289.) Plaintiff indicated that she was "able to complete ADLs [activities of daily living] independently" and that she "has no physical disabilities." (Tr. at 290.) Plaintiff was diagnosed with Post Traumatic Stress Disorder and Alcohol Abuse Early Full Remission, and was assessed a GAF score of 51. (Tr. at 293.) On October 20, 2011, Plaintiff reported that she was "able to conduct all ADLs and chores independently" and that her health was "good." (Tr. at 296.) Plaintiff needed help with food and clothing and indicated she was "[t]rying to get my SSI and coping with depression. I also need some counseling." (Tr. at 298.)

On December 22, 2011, notes authored by Melissa Draughn, therapist, indicated that Plaintiff and her therapist focused on implementing "3-4 coping skills for depression." (Tr. at 321.) On January 6, 2012, Plaintiff and her therapist "discussed past regrets" and how "utilizing supports and how resolving conflict can help" and Plaintiff found the session "real helpful." (Tr. at 318.) On January 23, 2012, Plaintiff reported that "everything is going good with her." (Tr. at 317.)

On February 27, 2012, Plaintiff was seen by John Head, D.O., who noted that Plaintiff reported "sadness, loss of interest, hopelessness, low energy, guilt, decreased appetite, insomnia, loss of libido, anxiety, flashbacks, paranoia, seeing hallucinations,

10

hearing voices, forgetfulness, poor concentration, irritability, anger-control problems, racing thoughts and rapid mood swings" and that although "[f]amily issues are stressful[,]" Plaintiff "has remained clean and sober." (Tr. at 420.) Despite these fairly serious reported symptoms, Dr. Head found Plaintiff "demonstrated good grooming, timeliness, orientation times four, sadness, fidgetiness, good eye contact, normal speech, intact judgment, logical and coherent thought process, below average intelligence, no obsessive or compulsive thought" and he recommended "[p]sychotherapy" and prescription medications, Cymbalta and Saphris. (Tr. at 420.)

On April 27, 2012, the goal of Plaintiff's therapy was for Plaintiff to "implement 3-4 coping skills for depression" and Plaintiff reported she was glad she came and talked with her therapist. (Tr. at 309.)

On June 28, 2012, Dr. Head noted that Plaintiff "demonstrated good grooming, timeliness, orientation times four, sadness, fidgetiness, good eye contact, normal speech, intact judgment, logical and coherent thought process, below average intelligence, no obsessive or compulsive thought[.]" (Tr. at 347.) Based on Plaintiff's reported symptoms, Dr. Head noted "non-command auditory hallucinations, visual hallucinations, fair insight and paranoid delusions…no current suicidal thoughts, intent or plan…no homicidal thoughts, plans or intent." (*Id.*) Dr. Head also noted that "[t]he patient was receptive to advice." (Tr. at 347.) Dr. Head diagnosed schizoaffective Disorder and Polysubstance Dependence, and assessed a GAF score of 50. (*Id.*) These same diagnoses had been made since October 2011. (Tr. at 348-53.)

11

Plaintiff was seen by her therapist on June 28, 2012, and July 17, 2012 for assistance in "utilize[ing] at least 2-4 coping skills for anxiety" that Plaintiff commented were "'very helpful.'" (Tr. at 300, 302.) On July 18, 2012, clinic staff helped Plaintiff meet her goal to successfully complete SSI paperwork and Plaintiff was "very happy that the forms were completed" and appreciated the help she was given. (Tr. at 299.)

On November 4, 2012, Plaintiff came to the emergency room indicating, "I took a bunch of pills." (Tr. at 380.) Plaintiff was diagnosed with suicidal ideation and acute alcohol intoxication, after she walked in on her husband and sister having sexual intercourse. (Tr. at 381, 383.) Later that evening, Plaintiff indicated that she "no longer wants to die, is clinically sober, and future oriented with her children as a focal point of pride (18 children)." (Tr. at 383.) Her eldest daughter Donetta reported that "there is an ongoing drama between Laurann and her husband but no h/o suicide attempt. She is not concerned for safety, thinks it was for attention and agrees to let Laurann stay with her for the time being…" (*Id.*) Plaintiff was released with a follow up appointment scheduled with Dr. Head at Team Mental Health for the next day. (Tr. at 388.)

On December 4, 2012, Plaintiff's therapist noted that Plaintiff described her goal as needing to make progress on her depression and anxiety and that she wanted to stop drinking. (Tr. at 438)The therapist set the goals as asking Plaintiff to "report at least 2-4 benefits of continued use of psychotropic medication" and that she "address at least 2-4 triggers for emotional issues and alcohol consumption." (*Id.*.) On April 4, 2013, more goals were set, such as striving to obtain more independence in finances and personal environment which Plaintiff described as "applying for SSI." (Tr. at 441.)

Plaintiff gave the highest marks possible for her satisfaction with the life skills program. (Tr. at 312-13, 327-28.) Plaintiff was also consistently noted to be oriented x4, fair to good insight and judgment, and receptive and engaged. (Tr. at 455, 460, 464, 467.)

A Mental Residual Functional Capacity ("RFC") Assessment was completed on December 26, 2012, by Dr. Aroon Suansilppongse. (Tr. at 392-94.) Dr. Suansilppongse opined that Plaintiff was moderately limited in her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, and the ability to complete a normal workday and workweek, but was otherwise not significantly limited in the fields of understanding and memory or sustained concentration and persistence. (Tr. at 392-93.) Plaintiff was also found to be moderately limited in the ability to interact appropriately with the general public, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, but was otherwise not significantly limited in social interaction. (Tr. at 393.) Dr. Suansilppongse found Plaintiff was moderately limited in her ability to set realistic goals or make plans independently of others but was otherwise not significantly limited in the area of adaption. (*Id*.) Dr. Suansilppongse concluded that Plaintiff "is able to understand and remember simple instructions[,]" is "able to carry out simple instructions[,]" and "complete tasks at an acceptable pace[.]" (Tr. at 394.) He also noted, however, that her symptoms would "interfere with her ability for appropriate interaction with supervisors, coworkers or the public" but she could "complete tasks with infrequent contact with others." (*Id*.) Finally, he noted that her "depressive reaction and

13

polysubstance abuse would occasionally interfere with her ability to set realistic goals or make plans independently of others." (*Id*.) Dr. Suansilppongse also opined that Plaintiff's impairment did not meet or equal any Listing. (*Id*.)

On February 7, 2013, Plaintiff reported to her therapist, Melissa Druaghn, that she had "definitely cut down on drinking." (Tr. at 460.)

On February 14, 2013, Dr. Head confirmed his previous observations and diagnoses. (Tr. at 415.) Betty Edwards, LLBSW, completed an assessment of Plaintiff's mental abilities needed to do unskilled work and found that she was seriously limited in a majority of the categories, including her ability to understand, remember and carry out very short and simple instructions. (Tr. at 416.) She did not find Plaintiff unable to meet competitive standards in any area, even in the ability to understand, remember and carry out detailed instructions. (Tr. at 416-17.) In addition, she found Plaintiff extremely limited in activities of daily living, and in maintaining concentration, persistence or pace, markedly limited in maintaining social functioning, and that Plaintiff has had four or more episodes of decompensation. (Tr. at 418.) Ms. Edwards also checked boxes indicating Plaintiff had a "medically documented history of a chronic organic mental, schizophrenic, etc.," disorder that has caused "[one] or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement" and that Plaintiff has "[a]n anxiety related disorder and complete inability to function independently outside the area of one's home." (*Id*.) Ms. Edwards also indicated Plaintiff would be absent more than four days per month because of her impairment and that she is "Disabled" without listing any findings. (Tr. at 419.)

14

On May 22, 2013, Progress notes authored by Melissa Draughn, therapist, indicated that Plaintiff was "working toward mental stability and overall wellness" and that she reported that therapy "'seems to be helping a little.'" (Tr. at 450.)

### 2.    Plaintiff's Testimony at the Administrative Hearing

Plaintiff testified that she has eighteen (18) children, that the youngest child is seven but that he does not live with her due to her past drug abuse problem. (Tr. at 37-38.) Plaintiff brought a cane with her to the hearing and indicated that she has been using it for about two years "[b]ecause I have arthritis in both of my knees and they swelled up so bad I can't walk without it." (Tr. at 38.) Plaintiff testified that she has never worked and when asked why not, she responded, "[b]ecause I have arthritis in both of my legs and I can't work." (Tr. at 39.) When further asked when the arthritis stared, Plaintiff stated, "It's been over two years when I noticed it." (*Id*.) When the ALJ further inquired why Plaintiff was not working before she had arthritis, Plaintiff responded, "I just never tried because one time I had my insurance with me [phonetic] but I just never had a job because my fiancé was taking care of me." (*Id*.)

Plaintiff also testified that she has difficulty with short-term memory and that this problem started "maybe three or four years ago." (Tr. at 40.) When asked how she occupies herself, Plaintiff indicated that she watches television less than two or three hours a day, and that she likes to watch Judge Mathis the most. (*Id*.) Plaintiff reported that she can walk only about one-half block with her cane and that she cannot walk at all without it. (Tr. at 41.) She stated that she can sit for "not even 30 minutes, about 15, 20 minutes, something like that" and that she can stand for "maybe five or ten minutes." (Tr.

15

at 41-42.) She also stated that she can only lift "[m]aybe five pounds" and that her fingers cramp all the time. (Tr. at 42.) Plaintiff reported that she does not grocery shop, that she "don't do any work at home. He [her fiance] do all the chores." (Tr. at 42.) The only thing Plaintiff does is occasionally make herself a sandwich. (Tr. at 43.) Plaintiff stated that she does not have any hobbies. (*Id.*) Plaintiff "used to smoke" but quit "three or four months ago" and she no longer uses marijuana or alcohol. (Tr. at 43-44.) Plaintiff testified that she naps every day for "maybe three hours" and lies on the couch for "[m]aybe eight hours" per day." (Tr. at 44, 46.) She further explained that she lies down to elevate her legs to reduce swelling. (Tr. at 46.)

### 3.    Vocational Expert Testimony at Administrative Hearing

The ALJ asked the Vocational Expert ("VE") a series of hypothetical questions, all based on an individual with the same age, education, and work experience as Plaintiff. (Tr. at 47.) All of the VE's testimony was consistent with the Dictionary of Occupational Titles. (Tr. at 50.) The VE defined the region as the State of Michigan. (Tr. at 47.) The first hypothetical individual was defined as one

> . . . who can perform work at the light exertional level. Cannot climb ladders, ropes or scaffolds. Can occasionally climb stairs or ramps, balance, stoop, kneel, crouch and crawl. Is limited to unskilled, simple repetitive work with minimal changes in the work setting and occasional contact with the general public, coworkers and supervisors.

(Tr. at 47-48.) The VE testified the hypothetical individual would be able to perform the 10,000 production worker or assembler jobs, the 5,500 sorter jobs, and the 8,800 hand packager jobs available in the region. (Tr. at 48.) If a sit-stand at will option were added,

the VE testified that the categories would remain but the available numbers would be lessened to 3,000 production worker jobs, 1,500 sorter jobs, and 2,500 hand packager jobs. (*Id.*) If such an individual needed to elevate her legs for "more than a few minutes at a time," the VE indicated that such a requirement would be work preclusive. (Tr. at 49.)

### F.      Governing Law and Analysis

If the Commissioner's decision applied the correct legal standards and is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. 42 U.S.C. § 405(g); *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006); *Mullen*, 800 F.2d at 545.

### 1.      Legal Standard

The ALJ determined that during the time Plaintiff qualified for benefits, she possessed the RFC to perform a limited range of light work. (Tr. at 23-26.)

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).
After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim.

17

I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2. Substantial Evidence

In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *see also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). A reviewing court must consider the evidence in the record as a whole, including any evidence that might subtract from the weight of the Commissioner's factual findings. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). There is no requirement that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his [or her] written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial evidence to support a different conclusion.'" *McClanahan*, 474 F.3d at 833 (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)); *see also Mullen*, 800 F.2d at 545. Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a

18

conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994); *see also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, but the only relevant distinction for present purposes is between "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2. Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner,

19

such as whether the claimant meets the statutory definition of disability and how to measure his or her residual functional capacity. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544. *See also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse*, 502 F.3d at 540-42; SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's residual functional capacity ("RFC"), and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

20

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner*, 375 F.3d at 390.

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL

21

374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quotation omitted), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment." 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain;

(iii)   Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

22

(v)   Treatment, other than medication, . . . received for relief of . . .

pain;

(vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to step five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### *a. Substantial Evidence Supported the ALJ's RFC Findings*

Plaintiff contends that the ALJ's RFC findings are not supported by substantial evidence because the ALJ "acknowledges that the claimant uses a cane in her decision but never makes any effort to incorporate those functional limitations in the RFC." (Doc. 13 at ID 537.) Plaintiff acknowledges that the ALJ's RFC and hypothetical incorporate

23

Dr. Shaw's findings but contends that the ALJ should not rely on Dr. Shaw's findings since Dr. Shaw considered Plaintiff's osteoarthritis "mild" despite imaging records which called her osteoarthritis "moderate." (*Id*.) Plaintiff also notes that use of a cane renders any work above sedentary precluded. (*Id*.) Plaintiff also contends that the ALJ failed to incorporate Plaintiff's moderate limitations in concentration, persistence or pace and that the ALJ was "obligated under law" to do so. (Doc 13 at ID 538.)

First, an ALJ is only obligated to include limitations that the ALJ finds credible and supported by the record. *Casey,* 987 F.2d at 1235. The question then becomes whether substantial evidence supports the ALJ's RFC findings. I suggest that it does.

Plaintiff has sought treatment for knee pain since 2011. (Tr. at 227, 389-90, 377.) In 2013, she was diagnosed with "extensive" osteoarthritis of the left knee and a valgus deformity was noted in both knees, with the left being worse, but the knee was noted to be "stable to valgus stressing." X-rays of Plaintiff's left knee showed "mild osteoarthritis of the left knee" and x-rays of Plaintiff's right knee showed "[m]oderate osteoarthritis of the right knee, progressed in the interval[.]" (Tr. at 408-09.) Therefore, Plaintiff's contention that Dr. Shaw was in error for referring to Plaintiff's arthritis as "mild" is consistent with the x-ray reading as to Plaintiff's right knee and differs only with the x-ray reading as to extent of the arthritis in the left knee. Dr. Shaw was free to disagree with the reader of the x-ray's conclusion and find that both the left and right knee showed "mild" arthritis or "degenerative changes." (Tr. at 376.) The ALJ was also free to give the substantial weight she accorded to Dr. Shaw's opinion. (Tr. at 25-26.) Finally, the ALJ was also free to rely on Dr. Shaw's finding that Plaintiff was able to walk without her

24

cane and that when she did so, there was no limp noted and her gait was "steady." (Tr. at 376.)

As to the RFC failing to properly account for moderate limitations in concentration, persistence or pace, Plaintiff's argument is "not uncommon and the case law resolves it both ways." *Hernandez v. Comm'r of Soc. Sec.*, No. 10-cv-14364, 2011 WL 4407225, at *9 (E.D. Mich. Aug. 30, 2011) (collecting cases). The *Hernandez* court stated that

> a hypothetical simply limiting a claimant to unskilled work may, in some instances, fail to capture a claimant's moderate limitation in concentration, persistence, or pace . . . . However, the Court also finds that there is no bright-line rule requiring remand whenever an ALJ's hypothetical includes a limitation of, for example, "unskilled work" but excludes a moderate limitation in concentration. Rather, this Court must look at the record as a whole and determine if substantial evidence supports the ALJ's hypothetical and RFC assessment.

*Id.* at *10 (citations omitted). In some cases courts will remand when an ALJ's "hypothetical does not include a specific reference to moderate limitations in concentration or pace and only limits the hypothetical individual to unskilled work or simple, routine tasks," but "other cases have found that an ALJ formed an accurate hypothetical by limiting the claimant to unskilled work and omitting a moderate concentration or pace limitation." *Taylor v. Commissioner of Soc. Sec.*, No. 10-CV-12519, 2011 WL 2682682, at *7 (E.D. Mich. May 17, 2011), *Report & Recommendation adopted*, No. 10-12519, 2011 WL 2682892 (E.D. Mich. July 11, 2011). "[T]here is no bright-line rule requiring remand" in these circumstances. *Roberts v. Comm'r of Soc. Sec.*, No. 10-cv-14064, at *8 (E.D. Mich. Aug. 8, 2011), *Report & Recommendation*

*adopted by* 2011 WL 4406344, at *1 (E.D. Mich. Sept. 22, 2011). Instead, "this Court must look at the record as a whole and determine if substantial evidence supports the ALJ's decision." *Id.*

In this case, the "unskilled" designation adequately reflects the evidence of mental health problems. Plaintiff indicated that she was "able to complete ADLs [activities of daily living] independently" and that she "has no physical disabilities." (Tr. at 290.) On October 20, 2011, Plaintiff reported that she was "able to conduct all ADLs and chores independently" and that her health was "good." (Tr. at 296.) Despite a fairly serious diagnosis and reported symptoms, Dr. Head found Plaintiff was consistently oriented times four, used normal speech, intact judgment, logical and coherent thought process, below average intelligence, and found no obsessive or compulsive thought.(Tr. at 420, 347, 383.) Finally, Dr. Suansilppongse found Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods, (Tr. at 392) but nonetheless concluded that Plaintiff is "able to understand and remember simple instructions[,]" is "able to carry out simple instructions[,]" and "complete tasks at an acceptable pace[.]" (Tr. at 394.)

### b. Substantial Evidence Supported ALJ's Step Three Analysis

Next, Plaintiff argues that the ALJ should have evaluated Plaintiff's inability to ambulate without a cane and her knee swelling under Listing 1.02 at Step Three. (Doc. 13 at ID 540-43.)

Claimants with severe impairments that meet or equal a listing in the Appendix and that meet the duration requirement are deemed disabled without further analysis. 20

26

C.F.R. § 404.1520(a)(4)(iii). The duration requirement is that, unless resulting in death, the severe impairment "must have lasted or must be expected to last for a *continuous* period of at least 12 months." 20 C.F.R. § 404.1509 (emphasis added). Fitting a claimant into a listing is dispositive and thus demands a higher level of proof: listed impairments preclude any gainful activity, not just substantial gainful activity. *See Zebley*, 493 U.S. 521, 525 (1990); 20 C.F.R. pt. 404, subpt. P, App. 1. Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. § 404.1525(c). A claimant must satisfy all of the criteria to meet the listing. *Id*; *see also Zebley*, 493 U.S. at 530 ("An impairment that manifests only some of those criteria, no matter how severely, does not qualify."). Alternatively, medical equivalence to a Listing can occur in three situations where the claimant fails to meet all of the criteria:

> (1) the claimant has a listed impairment but does not exhibit the specified severity or findings, yet has "other findings" that are "at least of equal medical significance" to the criteria; (2) the claimant has a non-listed impairment that is "at least of equal medical significance" to a listed impairment; or (3) the claimant has a combination of impairments which do not individually meet a Listed Impairment, but are "at least of equal medical significance" to a listing when viewed in totality.

*Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 415 n.2 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1526).

An ALJ retains discretion at this stage, and does not need to attach "any special significance to the source of a[] [medical] opinion . . . [regarding] whether an impairment meets or equals a listing." 20 C.F.R. § 404.1527(d)(3). This is particularly true for the first part of the analysis: "'[A]n ALJ is capable of reviewing records to determine

27

whether a claimant's ailments meet the Listings . . . .'" *Stratton v. Astrue*, 987 F. Supp.2d 135, 148 (D. N.H. 2012) (quoting *Galloway v. Astrue*, No. H-07-01646, 2008 WL 8053508, at *5 (S.D. Tex. May 23, 2008)). The Commissioner, however, has qualified the ALJ's discretion to decide equivalence, noting that "longstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the [ALJ] or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight." SSR 96-6p, 1996 WL 374180, at *3.

An ALJ that fails to undertake a detailed Step Three analysis has erred; further, the error is not harmless because the claimant might be presumed disabled with no need of any functional analysis at steps four and five. *Reynolds*, 424 F. App'x. at 416. The rule that an ALJ "evaluate the evidence," compare it to the Listing, and "give an explained conclusion" is "prudential and not jurisdictional"–it is impossible to determine whether substantial evidence supports an ALJ's determination without this analysis. *Id.* And because the requirement is prudential, a Plaintiff cannot waive this argument by not raising it. *Id.*

An ALJ is not, however, required to consider every Listing or to consider Listings that claimants "clearly do[] not meet." *Sheeks v. Commissioner of Social Security Administration*, 544 F. App'x 639, 641 (6th Cir. 2013). The ALJ's Step Three explanation is held to the same standard as the rest of the decision, and the ALJ does not need to "spell[] out every consideration that went into the step three determination" or recount every fact discussed elsewhere in the decision. *Bledsoe v. Barnhart*, 165 F.

A'ppx 408, 411 (6th Cir. 2006); *see also Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (noting that the ALJ does not need "to use particular language or adhere to a particular format in conducting his analysis"). If the necessary Step Three analysis appears elsewhere in the ALJ's decision, a court may find that it was also considered by the ALJ at Step Three even if it is not duplicated there. *See White v. Colvin*, No. 4:12-cv-11600, 2013 WL 5212629, *7 (E.D. Mich. Sept. 16, 2013) (finding Step Three analysis sufficient because the ALJ "described evidence pertaining to all impairments, both severe and non-severe, for five pages earlier in his opinion and made factual findings").

Because the burden at Step Three, both for meeting and medically equaling a listing, falls on the claimant, the ALJ's analysis at this step must always be viewed in light of the evidence presented by the claimant. Thus, the ALJ's analysis does not need to be extensive if the claimant fails to produce evidence that he or she meets the Listing. *See, e.g.*, *Sheeks*, 544 F. App'x at 641 ("[T]he ALJ need not discuss listings that the applicant clearly does not meet, especially when the claimant does not raise the listing before the ALJ."); *Ballardo v. Barnhart*, 68 F. App'x 337, 339 (3d Cir. 2003) (finding that a conclusory, single-sentence analysis was adequate where the claimant "presented essentially no medical evidence of a severe impairment"). Likewise, in *Retka v. Commissioner of Social Security*, the Sixth Circuit noted the need for expert opinions on the question of equivalence, but quickly shifted the focus to the "claimant's burden . . . to bring forth evidence to establish that he or she meets or equals a listed impairment." 70 F.3d 1272, 1995 WL 697215, at *2 (unpublished table decision) ("The absence in the record of medical evidence showing significant neurological deficits and muscle atrophy

29

supports the ALJ's conclusion . . . . [And] [t]hus, there is no merit to the plaintiff's

argument that the ALJ erred in failing to find his condition equivalent to the Listing . . .

.")." In that case, the ALJ had scoured the record, found that the plaintiff had produced no

evidence supporting disabling pain, and thus the Court rejected the attack on the decision.

*Id.*

I suggest that in this case, Plaintiff has failed to meet her burden at Step Three,

both for meeting or equaling Listing 1.02. A claimant with the following meets Listing

1.02:

> Major dysfunction of a joint(s) (due to any cause): Characterized by
> gross anatomical deformity (e.g., subluxation, contracture, bony or
> fibrous ankylosis, instability) and chronic joint pain and stiffness with
> signs of limitation of motion or other abnormal motion of the affected
> joint(s), and findings on appropriate medically acceptable imaging of
> joint space narrowing, bony destruction, or ankylosis of the affected
> joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip,
> knee, or ankle), resulting in inability to ambulate effectively, as
> defined in 1.00B2b;
>
> or
>
> B. Involvement of one major peripheral joint in each upper extremity
> (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform
> fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. Part 404, subpart P, Appendix 1 § 1.02. In this case Plaintiff clearly does not

meet the 1.02B criterion. Therefore, her burden is to show, among other things, an

inability to ambulate effectively,[2] chronic joint pain, and limited/abnormal motion. *Id.*; 20 C.F.R. § 404.1509. Further, all of these must meet the durational requirement. 20 C.F.R. § 404.1509. I suggest that the record in this case lacks evidence to support any of the criteria. Plaintiff was able to walk with no limp noted and her gait was "steady." (Tr. at 376.) Plaintiff had a normal range of motion and strength in her extremities. (See, Tr. at 266, 268, 275, 371, 381.) I therefore suggest that because an ALJ is "not required to consider every listing or to consider Listings that claimants "clearly d[o] not meet," *see Sheeks*, 554 F. App'x at 641, and because Plaintiff clearly does not meet the durational or the inability to ambulate effectively requirements of Listing 1.02, the ALJ was not under an obligation to analyze Listing 1.02. This conclusion is further supported by Dr. Suansilppongse's opinion that Plaintiff's impairment did not meet or equal any Listing. (Tr. at 394.)

### G.    Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "'zone of choice' within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035 (quoting *Mullen*, 800 F.2d at 545), as the decision is supported by substantial evidence.

---

[2] "Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00(B)(2)(b). An individual meets this condition when, for example, they need two crutches or canes, cannot walk without a walker, cannot travel alone, cannot use public transportation, or cannot walk. *Id.*

III.   **REVIEW**

Rule 72(b)(2) of the Federal Rules of Civil Procedure states that "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 155; *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). According to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: September 18, 2015                    S/ PATRICIA T. MORRIS
                                            Patricia T. Morris
                                            United States Magistrate Judge

## **CERTIFICATION**

    I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: September 18, 2015                    By s/Kristen Krawczyk
                                             Case Manager to Magistrate Judge Morris